## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

| | |
|---|---|
| Denita Shaw | Case No. |
| AND | |
| Bridget Brown, | **COMPLAINT FOR DAMAGES UNDER THE FAIR DEBT COLLECTION PRACTICES ACT, THE WISCONSIN CONSUMER ACT, THE FLORIDA CONSUMER COLLECTION PRACTICES ACT AND OTHER EQUITABLE RELIEF** |
|     Plaintiffs, | |
| v. | |
| Mercantile Adjustment Bureau, LLC, | |
|     Defendant. | **JURY TRIAL DEMANDED** |

## PARTIES

1. Plaintiff, Denita Shaw ("Denita"), is a natural person who resided in Milwaukee, Wisconsin, at all times relevant to this action.

2. Plaintiff, Bridget Brown ("Bridget"), is a natural person who resided in Opa Locka, Florida, at all times relevant to this action.

3. Defendant, Mercantile Adjustment Bureau, LLC ("Mercantile"), is a New York limited liability company that maintained its principal place of business in Williamsville, New York, at all times relevant to this action.

## JURISDICTION AND VENUE

4. Pursuant to 28 U.S.C. §1331, this Court has federal question jurisdiction over this matter as it arises under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.

5. Mercantile has significant and overwhelming contacts in Wisconsin because it regularly operates in Wisconsin, is organized and registered with the Wisconsin Secretary of State

since April 4, 2002, and has a registered agent in Wisconsin authorized to accept service of process.

6.   Mercantile has a systematic and continuous presence in Wisconsin and, as a result, is subject to the Court's jurisdiction.   Mercantile markets and advertises its services to Wisconsin businesses, has customers/clients located in Wisconsin, regularly and systematically contacts and communicates with Wisconsinites as part of its regular business practices.  For example, Mercantile's systematic conduct within Wisconsin State Lines include, but not limited to: regularly sending text messages (Thousands) to Wisconsin Consumers that have Wisconsin Telephone Numbers, placing tens of thousands of telephone calls to Wisconsin Consumers, receiving millions of dollars in collection payments from Wisconsin Consumers, regularly sending letters to Wisconsin Consumers inside the state of Wisconsin, regularly sending letters to Wisconsin Consumers outside the state of Wisconsin, regularly placing telephone calls to Wisconsin Residents in the 72 counties within Wisconsin using Wisconsin Long Distance Area Codes, regularly leaving voice messages on Wisconsin Consumers residential answering machines, regularly leaving voice messages on Wisconsin Consumers cellular voicemails, using an Automatic Telephone Dialing System to bombard Wisconsin Residents with autodialed telephone calls, the solicitation and hiring of vendors headquartered in Wisconsin, the hiring of lawyers authorized to practice law inside of Wisconsin, and who have appeared in Wisconsin Courts, the continuous and not isolated management of debt portfolios containing Wisconsin Residents' debts that were incurred within Wisconsin and subject to the laws of Wisconsin, and the solicitation of new collection accounts to collect within Wisconsin against Wisconsin Consumers' debts incurred within and subject to the laws of Wisconsin.  Finally, Mercantile has been repeatedly hauled into Court in Wisconsin

and has, without exception, defended itself in Wisconsin in both individual and Class Action cases and claims. Mercantile's conduct in and pertaining to Wisconsin is such that they are deemed to be "home" in Wisconsin.

7. Pursuant to 28 U.S.C. §1367(a), the Court also has Supplemental Jurisdiction over Denita's claims under the Wisconsin Consumer Act – Debt Collection ("WCA"), §§ 427.101, et seq.*,* because they share a common nucleus of operative fact with Denita's claims under the FDCPA.

8. Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over Bridget's claims under the Florida Consumer Collection Practices Act, Fla. Stat. ("FCCPA"), § 559.55, et seq., because those claims share a common nucleus of operative facts with Bridget's claims under the FDCPA. See LeBlanc v. Unifund CCR Partners, 601 F.3d 1185 (11th Cir. 2010) ("[FCCPA's] remedies are 'cumulative to other sanctions and enforcement provisions' for any violation by an out-of-state consumer debt collector.").

9. Pursuant to 28 U.S.C. § 1391(b), venue is proper because a substantial part of the events giving rise to these claims occurred in this judicial district.

## **JOINDER OF CLAIMS**

10. Rule 20 of the Federal Rules of Civil Procedure provides, in part:

(a) PERSONS WHO MAY JOIN OR BE JOINED.

(1) Plaintiffs. Persons may join in one action as plaintiffs if:

(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B) any question of law or fact common to all plaintiffs will arise in the action.

*See* Fed. R. Civ. P. 20(a).

11. "Under the [Federal] Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mineworkers of Am. v. Gibbs*, 383 U.S. 715, 724, 86 S. Ct. 1130, 1138 (1966).

12. "Rule 20 should be viewed in light of the overarching policy of Rule 1 which requires that the rules 'be construed and administered to secure the **just, speedy, and inexpensive** determination of every action and proceeding.' Fed. R. Civ. P. 1 (emphasis added)." *Patrick Collins, Inc. v. Doe*, 282 F.R.D. 161, 166 (E.D. Mich. 2012).

13. "'The purpose of [Rule 20] is to promote trial convenience and expedite the determination of disputes, thereby preventing multiple lawsuits. Single trials generally tend to lessen the delay, expense and inconvenience to all concerned.'" Id.; quoting *Mosley v. General Motors Corp*., 497 F.2d 1330, 1332 (8th Cir.1974).

14. The rule "does not require that **all** questions of law and fact raised by the dispute be common, but only that **some** question of law or fact be common to all parties." *Mosley v. General Motors Corp.*, 497 F.2d at 1332 (emphases included).

15. "The term 'transaction' is flexible, and claims arise out of the same transaction or occurrence so long as they are logically related events entitling a person to legal relief." *Nucorp, Inc. v. Doe*, 2012 U.S. Dist. LEXIS 187547, *12 (E.D. Mich. Oct 18, 2012); citing *Mosley*, 497 F.2d at 1333.

16. The analogous interpretation of the terms as used in Rule 20 would permit all reasonably related claims for relief by or against different parties to be tried in a single proceeding. Absolute identity of all events is unnecessary. *Mosley*, 497 F.2d at 1332.

17. Allegations of a company-wide policy that violates federal law have been held sufficient to establish that multiple plaintiffs' claims "arose out of the same series of transactions or occurrences." *Id* at 1334.

18. In the FDCPA context, allegations by multiple plaintiffs that they were subjected to the same collection practices by a single debt collector support joinder under Rule 20. See, e.g., *Scott v. Fairbanks Capital Corp.*, 284 F.Supp. 2d 880, 888-89 (S.D. Ohio 2003).

19. Joinder is particularly appropriate at the pre-trial stage of litigation where "the alleged acts occurred are quite similar for each [p]laintiff with the majority of each [p]laintiff's allegations occurring [during a limited time period]." See *Nelson v. Chertoff*, 2008 U.S. Dist. LEXIS 82981, *16 (N.D. Ill. Sep. 10, 2008).

## ADDITIONAL FACTORS SUPPORTING JOINDER

20. The witness(es) that Mercantile will produce in response to a notice of deposition pursuant to Rule 30(b)(6) will likely be the same individual(s) for each Plaintiff.

21. The information that Mercantile will provide in response to interrogatories related to Mercantile's policies, practices, and procedures will likely be the same, or substantially similar, for each Plaintiff.

22. The evidence that Mercantile will produce in response to requests for production of documents related to Mercantile's policies, practices and procedures will likely be the same, or substantially similar, for each Plaintiff.

23. Joinder will allow a single trier of fact to assess the pattern and frequency of Mercantile's alleged misconduct, which is a relevant factor in the legal issues and damages in this case.

24. Joinder avoids the need to conduct multiple trials and empanel multiple juries to resolve fairly straightforward claims that Mercantile violated the FDCPA.

## ARTICLE III STANDING COMMON TO ALL PLAINTIFFS

25. Plaintiffs have Article III standing to bring their FDCPA claims against Mercantile because Mercantile's communications in attempt to collect an alleged debt constitute an unwanted intrusion upon their solitude, seclusion, and peace and quiet, which are common law analogues to the FDCPA violations asserted below. See Vazzano v. Receivable Mgmt. Servs., LLC, 621 F. Supp. 3d 700, 709 (N.D. Tex. 2022) (receiving an unwanted letter "has a 'close relationship' to the type of harm protected by the common law tort of intrusion upon seclusion (protecting against intrusion into private solitude)) (citing TransUnion LLC v. Christinarez, ——— U.S. ———, 141 S. Ct. 2190, 2204 (2021)) (also citing Gadelhak v. AT&T Servs., Inc., 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) ("The harm posed by unwanted text messages is analogous to that type of intrusive invasion of privacy.")).

26. Mercantile's collection efforts with respect to the alleged debt caused Denita and Bridget to suffer concrete and particularized harm, inter alia, because the FDCPA provides Denita and Bridget with the legally protected right not to be misled about the legal status of a debt or treated unfairly with respect to any action for the collection of any consumer debt.

27. Moreover, the emotional distress Denita and Bridget experienced is a sufficient concrete injury to establish Article III standing. See Mayfield v. LTD Fin. Servs., L.P., No. 4:20-CV-01966, 2021 WL 4481089, at *4 (S.D. Tex. Sept. 30, 2021) (citing Rideau v. Keller Indep. Sch. Dist., 819 F.3d 155, 169 (5th Cir. 2016) ("[E]motional harm satisfies the 'injury in fact' requirement of constitutional standing.")) (additional internal quotation marks omitted); see also Smith v. Moss Law Firm, P.C., No. 18-2449, 2020 WL 584617, at *5 (N.D. Tex. Feb. 6, 2020) ("legal costs, anxiety, and worry" caused by defendant's alleged FDCPA violation were concrete and particularized injuries for purposes of FDCPA claim).

28. Mercantile's attempts to collect an alleged debt via electronic communications from Denita and Bridget after they sent it communication preferences are the type of harassment and invasions of privacy that Congress sought to protect by enacting FDCPA.

29. Mercantile's attempts to prevent electronic and/or written communications from consumers clearly "disadvantages other debt collectors," who properly follow FDCPA. 15 U.S. Code § 1692(e) (Congressional findings and declaration of purpose).

## ALLEGATIONS OF FACT COMMON TO ALL PLAINTIFFS

30. At all times relevant to this action, Mercantile collected consumer debts.

31. Mercantile regularly uses instrumentalities of interstate commerce and the mails to collect consumer debts owed or due or asserted to be owed or due another.

32. The principal source of Mercantile's revenue is debt collection.

33. Mercantile is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

34. As described, *infra*, Mercantile contacted Plaintiffs to collect a debt that was incurred primarily for personal, family, or household purposes.

35. This alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5).

36. Plaintiffs are "consumers" as defined by 15 U.S.C. § 1692a(3).

## ALLEGATIONS OF FACT AS TO PLAINTIFF, DENITA SHAW

37. On February 5, 2024, Mercantile emailed Denita to collect an alleged debt. *See* Exhibit A.

38. On February 6, 2024, Mercantile again emailed Denita (the "Second Email") to collect an alleged debt. *See* Exhibit B.

39. Due to Denita's unfortunate circumstances, similar to the financial strains affecting many Americans, she was unable to pay the debt.

40. Mercantile's emails to Denita, when she was unable to resolve the situation, caused anxiety similar to fire alarms going off in her head and she felt unable to put out the fire.

41. Denita did not want to receive further contact from Mercantile regarding the alleged debt until she might be able to pay it off.

42. The contents of the Second Email proposed that Denita contact Mercantile by using its online portal or by calling it on the telephone.

43. In order for Denita to use the Mercantile's online portal, Mercantile required her to create a login and accept its Terms and Conditions.

44. Accepting Mercantile's Terms & Conditions meant that Denita would accept and agree to receive electronic communication from it. *See* Exhibit C.

45. Denita was confused by Mercantile's website portal because its terms and conditions directly contradicted her notification preferences.

46. Mercantile's Terms and Conditions would have unfairly and unconscionably forced Denita to accept communications that she was explicitly trying to stop.

47. The other form of communication proposed by Mercantile in Second Email was telephone call.

48. In order to cease communications pursuant to 15 U.S.C. § 1692c(c), notice must be provided in writing.

49. An oral request to stop contact over the telephone by Denita would not be legally effective to cease communications from Mercantile, while at the same time it would open her up to a dialogue with one of its representatives.

50. Furthermore, given the well-known reputation of debt collectors over the phone, Denita did not want to speak to Mercantile.

51. Mercantile's unfair procedures for consumer communication confused and frustrated Denita about how she could reasonably and effectively inform Mercantile to stop contacting her.

52. Shortly after receiving the Second Email on February 6, 2024, Denita responded in kind to Mercantile through the channel of communication that Mercantile chose to use with her.

53. Denita sent an email to Mercantile's stating that she was "undergoing financial strain" and asked them to "not contact" her. *See* Exhibit D.

54. Later, Denita realized her email was rejected by Mercantile because Mercantile used a no-reply email address to communicate with her rather than use a bidirectional communication channel to communicate with her.

55. In addition to using a no-reply email address to communicate at Denita, Mercantile failed to provide any alternative email address for Denita to return Mercantile communication.

56. On February 7, 2024, Mercantile again emailed Denita to collect an alleged debt.

57. Through its harassment, Mercantile threw gas on the anxiety fire in Denita's head by continuing to contact Denita.

58. Denita responded to Mercantile's email again with a plea that it stop harassing and contacting her. *S*ee Exhibit E for Mercantile's February 7, 2024, email and Denita's response.

59. Later, Denita realized her email was rejected because Mercantile again used a no-reply email address to communicate with her rather than use a bidirectional communication channel to communicate with her.

60. Mercantile frustrated Denita by communicating with her electronically, but not allowing or providing an electronic method for her to communicate with it without her agreeing to unreasonable terms and conditions that would consent to additional electronic communication.

61. On February 13, 2024, Mercantile again emailed Denita again in attempt to collect an alleged debt. *See* Exhibit F.

62. On February 23, 2024, Mercantile called and left a voicemail for Denita in attempt to collect an alleged debt.

63. Mercantile's waves of communication left Denita feeling frustrated, confused and anxious because she could not reasonably reply to Mercantile while it continued to contact her.

## ALLEGATIONS OF FACT AS TO PLAINTIFF, BRIDGET BROWN

64. Mercantile aggressive and unusual communication policies affected Bridget, too.

65. On January 16, 2024, Mercantile emailed Bridget (the "Initial Collection Email") in attempt to collect an alleged debt. *See* Exhibit G.

66. Mercantile's Initial Collection Email instructed Bridget that she could correspond with it by (1) telephone or (2) through its online portal.

67. Bridget did not want to call Mercantile because she would be subject to talk offs and objections from its representatives. More importantly, in hindsight for good reason, Bridget didn't trust Mercantile and wanted a written record of her communications.

68. In order to for Bridget to use Mercantile's online portal, Mercantile required her to create a login and accept its Terms and Conditions. *See* Exhibit C.

69. Accepting Mercantile's Terms & Conditions meant that Bridget would accept and agree to receive electronic communication from it.

70. Bridget did not want further electronic communication or any telephonic communication from Mercantile, and agreeing to electronic communication was the opposite of her intent.

71. Bridget was confused by Mercantile's website portal because its terms and conditions directly contradicted her notification preferences.

72. Mercantile's Terms and Conditions would have unfairly and unconscionably forced Bridget to accept communications that she was explicitly trying to stop.

73. Mercantile's unfair procedures for consumer communication confused and frustrated Bridget about how to inform Mercantile of her communication preferences.

74. On January 24, 2024, Bridget replied to Mercantile's email, "I have no knowledge of this debt. Please communicate with me only by mail. How do I stop receiving electronic communications?" *See* Exhibit H.

75. Unbeknownst to Bridget, Mercantile purposefully setup its email policies to not receive responses from consumers.

76. Bridget believed that she responded to Mercantile through the communication channel that Mercantile chose to use with her.

77. However, Bridget's email was not delivered to Mercantile as Mercantile chooses to communicate to consumers using unilateral communication channels.

78. After Bridget sent Mercantile notice of her communication preferences, specifically to only receive mail and to stop electronic messages, Mercantile continued to send her electronic messages.

79. Mercantile systematic and intentional refusal to accept her communication electronically without consenting to additional electronic communication caused Bridget to be anxious and confused.

80. Mercantile continued a campaign of harassment with a repeated waves of emails to Bridget.

81. Mercantile emailed Bridget on January 24, 2024, about two hours after she emailed it. *See* Exhibit I.

82. Mercantile continued emailing Bridget on January 26, January 30, and February 1 in attempt to collect an alleged debt. These emails are substantially similar to the previous Mercantile emails and Exhibits.

83. Mercantile emails were sent, received, read and responded to less than 7 days apart, thus Mercantile engaged Bridget in repeated conversations with intent to harass.

84. Mercantile's waves of communication left Bridget feeling frustrated, confused and anxious because she could not reasonably reply to Mercantile while it continued to contact her.

85. After bringing her case to present counsel and during routine review of Bridget's evidence before filing the present case, counsel, as a more-sophisticated party, on February 2, 2024, opted Bridget out of future emails from Mercantile.

## ADDITIONAL ELECTRONIC COMMUNICATION ALLEGATIONS OF FACT COMMON TO ALL PLAINTIFFS

86. Mercantile uses technology, including but not limited to email, to send communications to collect alleged debts from consumers.

87. Its use of technology, *supra,* prevents consumers from communicating their communication preferences to Mercantile.

88. To assist consumers in situations like this, the CFPB has promulgated Rules requiring, *inter alia*, debt collectors to have clear and conspicuous methods for consumers to exercise their rights to cease future electronic communications ("Opt-Out Instructions").

89. Debt Collectors like Mercantile hope that consumers don't opt out of electronic communication as electronic communication is less expensive, per contact, than more traditional, non-electronic communication.

90. Electronic communication that can be directed *at* a consumer using an unmonitored and unresponsive communication channel is the most cost-effective form of communication for debt collectors like Mercantile.

91. However, Debt Collectors like Mercantile are not entitled to their most cost-effective forms of communication and, instead, are only entitled to use non-abusive, consumer desired, and convenient communication channels.

92. Not only does Mercantile's policies and procedures preclude consumers from replying to the emails themselves, Mercantile's federally mandated Opt-Out Instructions are obfuscated and are not clear and conspicuous.

93. In fact, a reasonable person could believe that Mercantile's opt out notice was specifically designed to go unnoticed by consumers, *inter alia,* in that it is hidden beneath the large font, images, and colors from the body of Mercantile's email.

94. Specifically, the Opt-Out Instructions, along with the request for consumers not to communicate with Mercantile by email ("No Reply Request") are provided in tiny font.

95. Mercantile's No Reply Request is also not clear and conspicuous and it is unreasonable that the least sophisticated consumer would read the tiny font at the bottom of an otherwise attention catching email from a debt collector.

96. Mercantile's policies and procedures for sending and receiving (or not receiving) emails from consumers fails to adequately process consumers' written requests.

97. As a result of their policies and procedures for sending and receiving (or not receiving) emails from consumers, Mercantile continues to contact consumers after consumers notify Mercantile in writing that its communications are inconvenient, unnecessary, or unwanted.

98. Upon information and belief, as discussed, *supra*, Mercantile's policies and procedures does not provide for adequately processing consumer responses sent in writing electronically fail to comply with the FDCPA and cause the needless harassment of consumers like Plaintiffs.

99. A debt collector that does not accept, acknowledge and/or process written requests from consumers violates consumers' federal rights.

100. It is unfair and unconscionable for Mercantile to not properly honor consumers' electronic message communications from consumers like Denita and Bridget, when Mercantile uses electronic messages to collect alleged debts from consumers.

101. Upon information and belief, Mercantile responds to consumers who call it via telephone. Mercantile's policies and procedures unconscionably denies consumers FDCPA when they are trying to exercise their rights by funneling consumers into oral communications over telephone or into accepting its contradictory Terms and Conditions for its online portal.

<u>**INDIVIDUAL COUNTS AS TO EACH PLAINTIFF**</u>

<u>**COUNT ONE – *Denita Shaw***</u>

**Violation of the Fair Debt Collection Practices Act**

102. Plaintiff re-alleges and incorporates by reference Paragraphs 25 through 63 and 86 through 101 above as if fully set forth herein.

103. In order to establish a violation of Section 1692d of the FDCPA, a consumer need not prove intentional conduct by the debt collector. *See Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2nd Cir. 2010); *Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 774 (7th Cir. 2013) ("[Plaintiff] points to no evidence in the record regarding [Defendant's] intent, which is just as well, because intent is irrelevant" in a § 1692d claim).

104. "Instead, applying an objective standard, as measured by the 'least sophisticated consumer,' the consumer need only show that the likely effect of the debt collector's communication or conduct could be construed as harassment, oppression or abuse." *See Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 721 (S.D. Tex. 2012).

105. The likely effect of Defendant's debt collection efforts, as measured by the "least sophisticated consumer" standard, was "to harass, oppress, or abuse" Plaintiff.

106. Defendant violated 15 U.S.C. § 1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Plaintiff in connection with the collection of the debt.

## COUNT TWO – *Denita Shaw*

### Violation of the Fair Debt Collection Practices Act

107. Plaintiff re-alleges and incorporates by reference Paragraphs 25 through 63 and 86 through 101 above as if fully set forth herein.

108. A debt collector's intent to violate the FDCPA may be inferred by its maintenance of policies and procedures which, in themselves, violate the FDCPA. *See Anchondo v. Anderson, Crenshaw & Associates, L.L.C.,* 256 F.R.D. 661, 671 (D.N.M. 2009); s*ee also Kromelbein v. Envision Payment Sol., Inc.*, 2013 WL 3947109, *7 (M.D. Penn. Aug. 1, 2013)("company policy can be just as much a violation of [FDCPA] as the rogue act of an individual employee. If anything, a company policy that violates the FDCPA is a more egregious transgression because it indicates endemic, rather than isolated, disregard for debtor rights."); *citing Edwards v. Niagara Credit Sol., Inc.*, 586 F. Supp. 2d 1346, 1354 (N.D. Ga. 2008) (awarding maximum damages in part because conduct was company policy, thereby making it routine and frequent).

109. Defendant's policies and procedures, as described in Paragraphs *supra*, constitutes "conduct the natural consequence of which is to harass, oppress, or abuse" consumers.

110. Defendant's practice, therefore, violates Section 1692d of the FDCPA, which provides:

> A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.

*See* 15 U.S.C. §1692d.

111. Because Defendant's practice, in itself, violates the FDCPA, it reflects an intent to harass consumers generally.

## COUNT THREE – *Denita Shaw*

### Violation of the Fair Debt Collection Practices Act

112. Plaintiff re-alleges and incorporates by reference Paragraphs 25 through 63 and 86 through 101 above as if fully set forth herein.

113. Defendant violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect the debt.

## COUNT FOUR – *Denita Shaw*

### Violation of the Wisconsin Consumer Act – Debt Collection

114. Plaintiff re-alleges and incorporates by reference Paragraphs 25 through 63 and 86 through 101 above as if fully set forth herein.

115. Under the WCA, a "claim" is "any obligation or alleged obligation arising from a consumer transaction." Wis. Stat. § 427.103(1).

116. Under the WCA, "debt collection" is "any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or due a merchant by a customer." Wis. Stat. § 427.103(2).

117. Under the WCA, a "debt collector" is "any person engaging, directly or indirectly, in debt collection[.]" Wis. Stat. § 427.103(3).

118. Based on the nature of Mercantile's business and the debt Mercantile alleged that Denita owed (*see* ¶¶ 28-32), Mercantile is a "debt collector" that was attempting to collect a "claim" under the WCA.

119. Wis. Stat. § 421.108 provides:

Every agreement or duty within chs. 421 to 427 imposes an obligation of good faith in its performance or enforcement. "Good faith" means honesty in fact in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing.

Wis. Stat. § 421.108.

120. Wis. Stat. § 427.104 provides, in part:

(1) In attempting to collect an alleged debt arising from a consumer credit transaction or other consumer transaction, including a transaction primarily for an agricultural purpose, where there is an agreement to defer payment, a debt collector may not:

\*\*\*

(h) Engage in other conduct which can reasonably be expected to threaten or harass the customer or a person related to the customer;

Wis. Stat. § 417.104(h).

121. Here, the allegations in the Paragraphs incorporated into this Count by reference demonstrate that Mercantile violated its duty of good faith by employing debt collection tactics that reflect neither "honesty in fact" nor "reasonable commercial standards of fair dealing."

122. Mercantile also violated Wis. Stat § 427.104(h) by engaging in collection efforts that could reasonably be expected to harass Denita.

## COUNT FIVE – *Bridget Brown*

### Violation of the Fair Debt Collection Practices Act

123. Plaintiff re-alleges and incorporates by reference Paragraphs 25 through 36 and 64 through 101 above as if fully set forth herein.

124. In order to establish a violation of Section 1692d of the FDCPA, a consumer need not prove intentional conduct by the debt collector. *See Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2nd Cir. 2010); *Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 774 (7th Cir. 2013) ("[Plaintiff] points to no evidence in the record regarding [Defendant's] intent, which is just as well, because intent is irrelevant" in a § 1692d claim).

125. "Instead, applying an objective standard, as measured by the 'least sophisticated consumer,' the consumer need only show that the likely effect of the debt collector's communication or conduct could be construed as harassment, oppression or abuse." *See Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 721 (S.D. Tex. 2012).

126. The likely effect of Defendant's debt collection efforts, as measured by the "least sophisticated consumer" standard, was "to harass, oppress, or abuse" Plaintiff.

127. Defendant violated 15 U.S.C. § 1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Plaintiff in connection with the collection of the debt.

## COUNT SIX – *Bridget Brown*

### Violation of the Fair Debt Collection Practices Act

128. Plaintiff re-alleges and incorporates by reference Paragraphs 25 through 36 and 64 through 101 above as if fully set forth herein.

129. A debt collector's intent to violate the FDCPA may be inferred by its maintenance of policies and procedures which, in themselves, violate the FDCPA. *See Anchondo v. Anderson,*

*Crenshaw & Associates, L.L.C.,* 256 F.R.D. 661, 671 (D.N.M. 2009); s*ee also Kromelbein v. Envision Payment Sol., Inc.*, 2013 WL 3947109, *7 (M.D. Penn. Aug. 1, 2013)("company policy can be just as much a violation of [FDCPA] as the rogue act of an individual employee. If anything, a company policy that violates the FDCPA is a more egregious transgression because it indicates endemic, rather than isolated, disregard for debtor rights."); *citing Edwards v. Niagara Credit Sol., Inc.*, 586 F. Supp. 2d 1346, 1354 (N.D. Ga. 2008) (awarding maximum damages in part because conduct was company policy, thereby making it routine and frequent).

130. Defendant's policies and procedures, as described in Paragraphs, *supra*, constitutes "conduct the natural consequence of which is to harass, oppress, or abuse" consumers.

131. Defendant's practice, therefore, violates Section 1692d of the FDCPA, which provides:

> A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.

*See* 15 U.S.C. §1692d.

132. Because Defendant's practice, in itself, violates the FDCPA, it reflects an intent to harass consumers generally.

<u>**COUNT SEVEN – *Bridget Brown***</u>

**Violation of the Fair Debt Collection Practices Act**

133. Plaintiff re-alleges and incorporates by reference Paragraphs 25 through 36 and 64 through 101 above as if fully set forth herein.

134. Defendant violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect the debt.

## COUNT EIGHT – *Bridget Brown*

### Violation of the Florida Consumer Collection Practices Act

135. Plaintiff re-alleges and incorporates by reference Paragraphs 25 through 36 and 64 through 101 above as if fully set forth herein.

136. At all times relevant to this action, Mercantile is subject to and must abide by Florida law, including the FCCPA, Fla. Stat. § 559.72.

137. Defendant is a "debt collector" as that term is defined in the FCCPA, Fla. Stat. § 559.55(7).

138. Plaintiff is a "consumer" as defined by the FCCPA and is a person whom the act was intended to protect, FCCPA, Fla. Stat. § 559.55(2).

139. Defendant attempted to collect a "debt" within the meaning of FCCPA, Fla. Stat. § 559.55(1).

140. Defendant willingly and knowingly violated Fla. Stat. § 559.72(7) by engaging in conduct which can reasonably be expected to abuse or harass Plaintiff.

141. As a result of the above violations of the FCCPA, Defendant is liable to Plaintiff for actual damages, statutory damages, and reasonable attorney's fees and costs, pursuant to Fla. Stat. § 559.77(2).

142. Based upon the willful, intentional, knowing, grossly negligent, repetitive and continuous conduct as described herein, Plaintiff is also entitled to an award of punitive damages in accordance with Fla. Stat. §§ 559.77 and 768.72.

### JURY DEMAND

143. Plaintiffs demand a trial by jury.

### PRAYER FOR RELIEF

144. Plaintiffs pray for the following relief:

a. Judgment against Defendant, in favor of each Plaintiff, for actual damages, statutory damages, and costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k;

b. Judgment against Defendant, in favor of Plaintiff, Denita Shaw, for actual damages, statutory damages, costs, and reasonable attorney fees pursuant Wis. Stat. §§ 425.308 and 427.105;

c. Judgment against Defendant, in favor of Plaintiff, Bridget Brown, for actual damages, statutory damages, costs, reasonable attorney's fees, and punitive damages pursuant to Fla. Stat. §§ 559.77 and 768.72; and

d. For such other legal and/or equitable relief as the Court deems appropriate.


RESPECTFULLY SUBMITTED,


Date:   May 10, 2024

By: /s/ Jeffrey S. Hyslip
Jeffrey S. Hyslip, Esq. (Ohio Bar No. 0079315)
Hyslip Legal, LLC
207 S. Harrison Street, Suite A
Algonquin, IL 60102
Phone: 614-362-3322
Email: jeffrey@hysliplegal.com

*Attorney for Plaintiffs, Denita Shaw*
*and Bridget Brown*